UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| LARRY VICKERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00566-JPH-MJD |
| | ) | |
| PABLO PEREZ, | ) | |
| MICHEAL MITCHEFF, | ) | |
| SUSAN SMOOTHERLY, | ) | |
| KERRIGAN M. FEIDER, | ) | |
| KARI PIERCE, | ) | |
| CARRIE J. MCGARR, | ) | |
| CHERYL PETTY, | ) | |
| TAYLOR FORQUER, | ) | |
| WEXFORD OF INDIANA, LLC, | ) | |
| JAMIE GIBBENS, | ) | |
| ERIK A. FALCONER, | ) | |
| PAUL SOUTHWICK, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Larry Vickery, a prisoner in the custody of the Indiana Department of
Correction (IDOC), alleges that prison officials were deliberately indifferent to his
serious medical conditions and retaliated against him for using the grievance
process and filing a lawsuit. Mr. Vickery's Eighth Amendment deliberate
indifference claims are brought against medical services provider Wexford of
Indiana, LLC, its regional medical director, his treating physicians, and several
members of the nursing staff while his First Amendment retaliation claim is
brought against addiction counselor Paul Southwick.

The defendants have filed a motion for summary judgment. For the reasons that follow, the motion is **granted in part and denied in part**. The Court **grants** summary judgment to Dr. Falconer, Nurse Forquer, and Nurse Pierce; and **grants in part and denies in part** summary judgment to Dr. Mitcheff, Dr. Perez, Nurse Practioner Petty, and Nurse Moothery, and **denies** summary judgment to the remaining defendants.

## I. Summary Judgment Standard

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3);

it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. Factual Background

### A. Mr. Vickery's Diabetes Treatment before Entering Prison

Mr. Vickery was diagnosed with diabetes at age 21. Dkt. 213-12 at 24. For 13 years, he took medication and insulin. *Id.* Doctors learned he was allergic to Levemir and "about five or six other types" of insulin. *Id.* Eventually, he was prescribed a brand of insulin called Lantus, which he tolerated best. *Id.* There were times when he lacked insurance, and his doctors would try a less expensive insulin, but he invariably had "a bad reaction" and "end[ed] up back on the Lantus every time." *Id.*

Mr. Vickery was incarcerated at the Lake County Jail from July 2017 until October 2018. Dkt. 213-16; dkt. 228-1 at ¶ 17. Before his arrest, he was not taking insulin, because he was "on the run." Dkt. 213-12 at 25; dkt. 228-1 at ¶

7. His jail medical records list his allergy to Levemir but not to other types of insulin. Dkt. 213-16.

At the Lake County jail, his diabetes was managed with Lantus and other medication, including Metformin and Glipizide. *Id*; dkt. 213-12 at 27. He was prescribed a second type of insulin, called Novolin. Dkt. 213-16. He did not take Novolin because his diabetes was effectively managed with Lantus and medication, and a nurse practitioner told him to just "keep doing what [he] was doing." Dkt. 213-12 at 26.

**B. Mr. Vickery Enters the IDOC**

In late 2018, Mr. Vickery was transferred from the jail to the IDOC. Dkt. 213-12 at 27. His first IDOC facility was the Reception Diagnostic Center ("RDC"). *Id.* He told the medical staff at RDC that he needed to take Lantus for diabetes. *Id.* But the medical staff told him that "they do not prescribe Lantus in [IDOC]" and that they would manage his diabetes with non-insulin medication alone. *Id.* The medications they prescribed, Metformin and Glipizide, had also been prescribed at Lake County Jail. *Id.*

**C. Mr. Vickery's Treatment at Putnamville Correctional Facility**

Mr. Vickery was at Putnamville Correctional Facility from November 2018 to May 2021. Dkt. 213-13 at 305-11, 377-79. He was treated by defendants Dr. Pablo Perez, Nurse Practitioner Cheryl Petty, Nurse Kerrigan Feider, Nurse Kari Pierce, Nurse Carrie McGarr, Nurse Taylor Forquer, and Nurse Jamie Gibbens. Dkts. 213-2, 213-3, 213-4, 213-5, 213-6, 213-9, 213-11. These

defendants were employed by defendant Wexford. *Id.* Wexford's regional medical director was defendant Dr. Michael Mitcheff. Dkt. 213-10.

Mr. Vickery had frequent appointments with Dr. Perez, Nurse Practitioner Petty, and the other nursing defendants during his 2.5 years at Putnamville. *See generally* dkt. 213-13 (Medical Records). There were numerous requests for offsite care and non-formulary medications, which were reviewed by Dr. Mitcheff or his deputy. *Id.* Mr. Vickery had several co-morbid medical conditions, many of which were symptomatic of diabetes. *Id.*

### 1. Insulin Allergies

#### i. Lantus Requested, Denied, and Later Approved in 2019

When Mr. Vickery arrived at Putnamville, Nurse McGarr told him, "you're not going to get Lantus here. That's too expensive." Dkt. 213-12 at 32. Nurse Practitioner Petty echoed Nurse McGarr during her first appointment with Mr. Vickery, telling him that Lantus was too expensive and that he needed to control his diabetes by drinking lots of water and exercising. *Id.*

On February 18, 2019, Mr. Vickery told Dr. Perez that he was allergic to all forms of insulin besides Lantus. Dkt. 213-11 at ¶ 9; dkt. 213-13 at 259. Dr. Perez thought this was "a strange report, as patients can often be allergic to a specific type of insulin, but [he] had never heard of a patient being allergic to all forms except for one." Dkt. 213-11 at ¶ 9. At that point, Mr. Vickery had been off insulin for several months, and Dr. Perez "decided that we would try an initial period of diabetic management with a mixture of lifestyle modification and the medication." *Id.*

Four months later, Dr. Perez believed "it was clear that lifestyle modification and medication was not sufficiently controlling his diabetes." *Id.* at ¶ 10. Mr. Vickery had a large diabetic ulcer on his toe, diabetic retinopathy affecting his vision, and diabetic neuropathy causing pain and burning in his extremities. Dkt. 213-11 at ¶¶ 10-16. His average blood sugar, measured by his A1C, was too high and "going up." Dkt. 211-13 at 204. Mr. Vickery again told Dr. Perez that he was allergic to all types of insulin and required Lantus. *Id.* Dr. Perez noted in the medical record "He cannot take either R or N insulin and developed sores from [Levemir]. He used to take Lantus and do wonders (*sic*) for his diabetes." *Id.*

Dr. Perez submitted a "formulary exception" for Lantus on June 25, 2019. Dkt. 213-11 at ¶ 17. A formulary is a list of medications that can be prescribed without approval. *Id.* at ¶ 18. Many non-formulary medications are expensive. Dkt. 213-10 at ¶ 4. Lantus was non-formulary, and thus could only be prescribed upon approval by the regional medical director, Dr. Mitcheff, or the associate regional medical director, Dr. Pierce. *Id.*

Mr. Vickery's first formulary exception request for Lantus was denied. *Id.* at ¶ 10. Dr. Mitcheff "did not see a therapeutic advantage to the use of a long acting insulin" such as Lantus "versus an intermediate acting insulin" such as Novolin. *Id.* He did not credit Mr. Vickery's self-report that he was allergic to all forms of insulin other than Lantus, given that his Lake County Jail medical records listed a Novolin prescription and only listed an allergy to Levemir. *Id.*

After the formulary exception request was denied, Novolin was prescribed as an alternative treatment plan. Dkt. 213-11 at ¶ 19. About a week later, on July 3, Mr. Vickery told Dr. Perez that he had previously taken Novolin and it made him pass out. *Id.* at ¶ 20; dkt. 213-13 at 196. Dr. Perez submitted a second formulary exception request for Lantus, which Dr. Pierce approved on July 9, 2019. Dkt. 213-11 at ¶ 21; dkt. 213-13 at 190.

On August 2, 2019, Nurse Feider accidentally administered Novolin insulin instead of Lantus insulin. Dkt. 213-13 at 182-83. When she caught her mistake, she called Nurse Practitioner Petty, who told her to keep Mr. Vickery in the medical unit for observation. *Id.* Nurse Feider reported that Mr. Vickery, "said he felt okay and voiced no complaints." *Id.* at 183. Mr. Vickery says this medical record is inaccurate and that he had allergic reactions, including "redness, swelling and itching at the injection site. [His] eyes got itchy, [he] experienced tightness in [his] throat, and [his] tongue swelled." Dkt. 228-1 at ¶ 104.

### ii.   Lantus Prescription Discontinued in 2020

On March 13, 2020, Dr. Perez submitted a formulary exception request to continue Mr. Vickery on Lantus. Dkt. 213-13 at 74. Dr. Mitcheff denied the request. *Id.* Dr. Mitcheff "noted that Mr. Vickery still had significantly elevated A1C levels despite the continued use, and increasing dosage, of Lantus insulin." Dkt. 213-10 at ¶ 19. He did not credit Mr. Vickery's self-reported allergy to other forms of insulin and "recommended that [he] receive a regular insulin combination to improve his diabetic control." *Id.*

### iii.     Allergic Reactions to Novolin in 2020

In April 2020, Mr. Vickery told Dr. Perez that he was "not comfortable with taking [Novolin]," but Dr. Perez told him that he did not have any other insulin options. Dkt. 213-12 at 38.

On April 14, 2020, Nurse Feider emailed Dr. Mitcheff that "[t]here is documentation from the county jail where offender Vickery was previously incarcerated at that supports poor tolerance to NPH and Regular insulins." Dkt. 228-5 at 55. Dr. Mitcheff replied, "Poor tolerance in what way? NPH is an appropriate basal insulin. It can be started slowly and titrated up. We don't give patients what they want but what they need. If he was controlled on Lantus it would be different. Looking at his commissary he is not committed to DM control. His use of simple sugars is the etiology of his hypoglycemia." *Id.*

On April 23, 2020, Mr. Vickery received a dose of Novolin from Nurse Feider. Dkt. 213-12 at 38; dkt. 213-13 at 63.  He asked to stay in the medical unit for observation given his allergy, but Nurse Feider told him to return to his dorm. Dkt. 213-12 at 38. Shortly thereafter, he "noticed a tightness in [his] chest. It was all red. It was like . . . a rash starting almost, and [he] could feel just slightly tightness in [his] throat and [his] tongue was getting a little fuzzy feeling." *Id.*

The officer on duty called Nurse McGarr and asked if Mr. Vickery could return to the medical unit, but she did not allow him to. *Id.* The allergic reaction "progressively started getting worse," and the officer on duty eventually released Mr. Vickery to request treatment from the medical unit. *Id.* Mr. Vickery returned

to the medical unit around 10:55 a.m. Dkt. 213-13 at 63. Nurse Practitioner Petty was called and directed the nursing staff to call Dr. Mitcheff. *Id.* at 62. Dr. Mitcheff ordered a Benadryl shot. *Id.* At 9:00 p.m., Dr. Mitcheff called back. *Id.* By this time, Mr. Vickery's "rash had spread from neck to chest and abdomen. Right arm red with red lines. He reported that it feels like there are bugs crawling on him." *Id.* (cleaned up). Dr. Mitcheff ordered another shot of Benadryl and ordered Dr. Perez to see Mr. Vickery in the morning to adjust his insulin. *Id.*

Dr. Mitcheff did not revisit the formulary exception request for Lantus at that time. Dkt. 213-10 at ¶ 21. According to Dr. Mitcheff, although "Mr. Vickery was reporting that this rash was caused by the insulin, the rash could also have been from many other causes." *Id.* at ¶ 21.

The next morning, Mr. Vickery met with Dr. Perez and Nurse Feider. Dkt. 213-12 at 39. Dr. Perez told Mr. Vickery that his body would get used to the Novolin and ordered Nurse Feider to give him a second injection. *Id.* Nurse Feider said, "I do not want to give you this medication . . . I don't like the reaction you're having," but Dr. Perez ordered her to administer the injection anyway. *Id.* at 11. Mr. Vickery's allergic reaction to this shot was worse than his allergic reaction the previous day. *Id.* at 39. The next time that Mr. Vickery went to the medical unit for Novolin, Nurse Feider refused to administer the injection due to his allergic reactions. *Id.*

On April 27, Mr. Vickery received his third dose of Novolin, which was administered by Nurse McGarr. *Id.* This dose caused the worst reaction of the three. *Id.* According to Mr. Vickery, "My whole body hurt, felt like I was hit by a

car. I mean, it was body ache, the whole body was hurting, everything hurt." *Id.*
He returned to the infirmary, where he was held overnight. *Id.* In the medical
record from this infirmary stay, Dr. Perez noted that this allergic reaction was
"worse than the last one. He had more rash and started tightness in his throat
and itchy numb tongue. Obviously he has allergic reaction to that type of insulin.
He does not want to take it and I am not going to insist. Will find alternative. He
did well with the Lantus." Dkt. 213-13 at 57 (cleaned up).

Dr. Mitcheff approved a formulary exception request for Lantus, and this
approval remained in effect through at least June 30, 2021, at which time
Wexford was no longer providing medical services to IDOC. Dkt. 213-10 at ¶ 22.
In March 2021, Mr. Vickery's A1C level was 7.7, an improvement over his A1C
level of 8.4 a year earlier. *Id.*

### 2. Toe Ulcer

Mr. Vickery had a diabetic toe ulcer on his left big toe upon entering Lake
County Jail in July 2017. Dkt. 213-16 at 4-5. This toe ulcer healed and calloused
over before his transfer to IDOC in 2018. 213-12 at 28, 35. In March 2019, the
callous reopened. Dkt. 213-12 at 35. His first medical appointment for the ulcer
was with Nurse Practitioner Petty on March 6, 2019. Dkt. 213-13 at 259-61.

Over the next two years, the ulcer was treated onsite. Mr. Vickery received
regular x-rays, which showed soft tissue swelling and infection, but did not show
a bone infection. *Id.* at 21, 35, 111, 145, 417. Treatment included debridement
of necrotic tissue and paring of callous tissue, both performed by Dr. Perez. *Id.* at
3, 30-31, 66-67, 89-90, 112-13, 125-26, 167, 191-92, 230, 231-32, 414. Dr.

10

Mitcheff approved a formulary exception for Minerin cream. *Id.* at 54. Mr. Vickery received antibiotics including ointments, Bactrim, Doxycycline, Ampicillin, Kephlex, and clindamycin. Dkt. 213-11 at ¶¶ 16, 17, 20, 41. He received wound care from the nursing staff and from himself. Dkt. 213-13 at 1-2, 15-18, 134, 141-42, 149-50, 153-56, 208, 221, 223, 249-50, 383, 408-09.

The ulcer occasionally improved but never healed. On March 15, 2019, the ulcer was about 1 cm x 1 cm. Dkt. 213-11 at ¶ 13. On March 26, a staff member emailed Dr. Perez and Nurse Pierce saying, "Wound to toe is getting worse. He is having increased pain. The redness is spreading. There is now a foul odor. Antibiotics are not helping." Dkt. 228-2 at 54. That same day, Dr. Perez debrided the ulcer, drained the abscess, and ordered another cycle of antibiotics. Dkt. 213-11 at ¶ 14. Mr. Vickery states that Dr. Perez fashioned a used surgical glove into a makeshift wound care drain and inserted the used glove into his toe. Dkt. 228 at ¶ 78. Nurse Pierce states that Dr. Perez used "a sterile piece of glove as a drain." Dkt. 228-9 at 114. On April 11, 2019, a non-defendant nurse noted, "Wound has malicious odor, ofd c/o flap of dead skin hurt/tugging when trying to walk." Dkt. 228-2 at 73.

By May 6, 2019, the ulcer was about 3 cm x 3 cm and was still infected. Dkt. 213-11 at ¶ 16; dkt. 228-2 at 82. After more debridements and antibiotics, it improved some by the end of July 2019. Dkt. 213-11 at ¶ 23. But two months later, the ulcer was infected again. *Id.* at ¶ 26. On October 21, 2019, Mr. Vickery told a nurse that the ulcer "smelled horrible and there was bright red blood." Dkt. 228-3 at 29 (cleaned up). The next day, Nurse Feider reported, "the left great

toe has yellow drainage and smells horrible. Left great toe does not appear to be healing, but getting worse." *Id.* at 33. Dr. Perez ordered a culture, which was positive for strep. *Id.* at 35.

On October 24, Nurse Moothery wrote to Dr. Perez, Dr. Mitcheff, Nurse Practitioner Petty, and others sending a photo of the ulcer and expressing her concern that the ulcer was resistant to treatment. *Id.* at 38–39. By October 27, the ulcer measured 4 cm x 4 cm. Dkt. 228-4 at 2. On November 13, 2019, the ulcer was still positive for strep. *Id.* at 10. It tested positive for strep again on January 16, 2020. Dkt. 228-5 at 1. The ulcer was positive for strep and MRSA on February 3, 2020. Dkt. 228-5 at 6. In July 2020, it was "swollen and tender." *Id.* at ¶ 58. In September 2020, it was positive for strep and E. Coli. Dkt. 228-6 at 56.

Dr. Perez found the ulcer "more concerning" in November 2020, and he ordered the resumption of regular wound care, with dressing changes and medication. *Id.* at ¶ 63. The ulcer tested positive for MRSA on November 5, 2020, December 8, 2020, January 6, 2021, January 20, 2021, and February 17, 2021. *Id.* at 64, 69, 72; dkt. 228-7 at 5, 9. On March 3, 2021, the ulcer tested positive for MRSA and strep. *Id.* at ¶ 71. The ulcer had become "deeper and more tender." *Id.* Two days later, Dr. Perez noted that the "[l]eft big toe ulcer is getting worse. It is more tender and has a very foul smelling minimal drainage." Dkt. 213-13 at 414. Mr. Vickery regularly complained of pain and swelling during this time. Dkt. 213-11 at ¶¶ 64-70.

On April 1, 2021, Dr. Perez submitted a request for offsite wound care, which was approved by Dr. Mitcheff. Dkt. 213-13 at 330. The request states, "Wound slowly heals but flares for 2 years now. The ulcer gets bigger and deeper. No [b]one involvement. Wound cultures always come back +MRSA." *Id.* On April 15, 2021, Mr. Vickery had an offsite wound care appointment. Dkt. 213-11 at ¶ 78; dkt. 213-13 at 381-82. According to Mr. Vickery, "the second the doctor looked at [the ulcer]," she said, "You might lose your foot. I'm willing to bet you have osteo[myelitis]. The tunneling is too deep. This is all the way to the bone. I need an MRI." Dkt. 213-12 at 40.

Dr. Perez submitted an offsite request for an MRI. Dkt. 213-13 at 406. He explained that an MRI was necessary because a bone infection may not appear on a regular x-ray. *Id.* Dr. Mitcheff approved the request. *Id.* On April 28, 2021, the MRI showed a bone infection. *Id.* at 403. On May 10, 2021, Dr. Perez submitted an offsite request for a catheter placement for intravenous antibiotics and an offsite request for a visit with an orthopedic surgeon. Dkt. 213-11 at ¶¶ 81, 82. Dr. Mitcheff approved both requests. Dkt. 213-10 at ¶¶ 28-29.

Mr. Vickery's affidavit states that Dr. Perez performed painful toe debridements without local anesthesia about "[h]alf the time," and that Nurse Practitioner Petty was present during these procedures. Dkt. 228-1 at ¶ 75–76. Mr. Vickery describes the pain from these procedures as "excruciating." *Id.* He also states that Dr. Perez ordered diabetic shoes in March 2019 to help his toe heal, but that Dr. Perez, Nurse Moothery, and Nurse Practitioner Petty did not

follow up to ensure that he received them and that he did not receive his diabetic shoes until the spring of 2022. *Id.* at ¶¶ 65-70.

Mr. Vickery was transferred to New Castle Correctional Facility on May 19, 2021. Dkt. 213-11 at ¶ 85. Dr. Perez and the nursing defendants were not responsible for his care after his transfer. *Id.* Mr. Vickery's left big toe was amputated on June 9, 2021. Dkt. 213-13 at 386.

### 3. Diabetic Retinopathy

Diabetic retinopathy is an eye condition that can cause vision loss and blindness in people who have diabetes.[1] Damage to the eye occurs when sugar blocks the tiny blood vessels that go to the retina, causing them to leak fluid or bleed.

On February 1, 2019, Mr. Vickery reported a sudden loss of vision and bleeding behind his left eye. Dkt. 228-1 at ¶ 48; *see* dkt. 213-13 at 264-65. Nurse Practitioner Petty states that she performed an eye flush on February 1, 2019, when Mr. Vickery reported a sudden loss of vision, and that she ordered that he be referred to an onsite optometrist the following Monday. Dkt. 213-9 at ¶ 6. Mr. Vickery states that he did have a referral "to any eye doctor" the following Monday. Dkt. 228-1 at ¶ 49. According to Mr. Vickery's affidavit, Dr. Mitcheff, Dr. Perez, Nurse Practitioner Petty, and Nurse Moothery prevented him from receiving eye care for this condition for six months.  Dkt. 228-1 at ¶¶ 46–50. He

---

[1] https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/diabetic-retinopathy#:~:text=Diabetic%20retinopathy%20is%20an%20eye,at%20least%20once%20a%20year.

did not see an optometrist or an ophthalmologist in early 2019, but first saw an ophthalmologist in August 2019 for laser eye surgery and was diagnosed with proliferative diabetic retinopathy. Dkt. 228-1 at ¶ 50–52.[2]

On October 14, 2019, Mr. Vickery had laser eye treatment from an offsite ophthalmologist. *Id.* at 166. He had another ophthalmology appointment on December 31, 2019. *Id.* at 95. Dr. Mitcheff approved a six-week follow-up, and Mr. Vickery was seen by an ophthalmologist on February 17, 2020. *Id.* Dr. Mitcheff approved more follow-up ophthalmology appointments on April 14, 2020, and May 14, 2020. *Id.* at 44-46, 71.

Mr. Vickery had an ophthalmology appointment on July 23, 2020, but Dr. Mitcheff denied the optometrist's request for a 6-month follow-up because his vision and retinopathy were stable and the optometrist was qualified to perform "a dilated fundus exam and assess for retinopathy and the need for potential surgical intervention." *Id.* at 39; dkt. 213-10 at ¶ 24. But three months

---

[2] Mr. Vickery's medical records, however, indicate that the onsite optometrist diagnosed him with "new proliferative diabetic retinopathy with mild vitreous [hemorrhage]" on February 5, 2019 and submitted an urgent offsite request for an ophthalmology consult. Dkt. 213-13 at 262-65. Dr. Mitcheff approved this request. *Id.* On April 14, 2019, the optometrist submitted a request for a follow-up with the ophthalmologist for a second round of eye injections. *Id.* at 239. Dr. Pierce denied this request, writing, "ATP for onsite care, the patient needs better diabetic control." *Id.* at 240. On July 15, 2019, the optometrist submitted another request for an ophthalmology follow-up. *Id.* at 187-88. The request states, "Refer to ophthalmology for proliferative DM retinopathy OS with macular edema. Preretinal [hemorrhages] and macular [hemorrhages] present." *Id.* at 188. Dr. Mitcheff approved this request. *Id.*; dkt. 213-10 at ¶ 12. On August 20, 2019, the optometrist submitted another request for an ophthalmology follow-up, stating, "Refer to Ophthalmology for more PRP laser treatment for proliferative DM retinopathy. He was last treated 8/13/19." Dkt. 213-13 at 173.

later, Dr. Mitcheff reevaluated and approved the offsite request. Dkt. 213-13 at 23; dkt. 213-10 at ¶ 25.

Dr. Perez states that he "deferred management of the eye condition to the recommendations of our onsite optometrist." Dkt. 213-11 at ¶ 12. Nurse Moothery states that "specific recommendations regarding specialists, referrals, and necessary treatment fall outside the scope of her practice. But as Director of Nursing, she was made aware of the recommendations" that Mr. Vickery see an ophthalmologist. Dkt. 213-1 at ¶ 7 (cleaned up). In a medical record dated June 29, 2019, Nurse Feider stated that Mr. Vickery's "diet and eye doctor issue need to be addressed with Susan [Moothery] because she handles both of those." Dkt. 213-13 at 200.

### 4. Kidney Stones / Vas Deferens Calcification

Mr. Vickery developed kidney pain in January 2020. Dkt. 228-1 at ¶ 111. He reported the issue to Dr. Perez during an appointment on January 8, 2020. Dkt. 213-13 at 117-19. Dr. Perez believed that the kidney pain indicated a urinary tract infection and ordered antibiotics. Dkt. 213-11 at ¶ 38. Mr. Vickery told Nurse Forquer that he had kidney problems before his incarceration during an appointment on January 13, 2020. Dkt. 228-4 at 32. Mr. Vickery's pain got worse "[d]uring the first quarter of 2020" and "he was regularly passing kidney stones which [were] extremely painful." Dkt. 228-1 at ¶ 120.

On February 26, 2020, Dr. Perez submitted an offsite request for a CT scan of Mr. Vickery's abdomen, explaining that he "[c]ontinue[d] to complain of gross hematuria and left flank pain for few months now. Labs are ok and abdominal

16

x rays are reported neg." Dkt. 213-13 at 93. Dr. Mitcheff denied the request for a CT scan initially, but reconsidered and approved the request on March 9, 2020, "due to some slight abnormalities in the urinalysis." Dkt. 213-10 at ¶¶ 15-16.

The CT scan showed a 4 mm kidney stone in Mr. Vickery's right kidney. Dkt. 213-13 at 81. According to Dr. Perez, "[a] stone of this size, smaller than 5 mm, typically does not require surgical intervention and can pass on its own. Importantly, there is no sign of any obstruction in the kidney in the CT scan, or significant abnormality that would have necessitated off-site medical treatment." Dkt. 213-11 at ¶ 47. After the CT scan, Mr. Vickery "asked for a urology consult. [Mr. Vickery] explained to him that [he] could not live with the excruciating pain that [he] had been having." Dkt. 228-1 at ¶ 123. Mr. Vickery's "kidney pain persisted, and [he] continued to urinate blood and pass painful kidney stones. But Dr. Perez still would not sen[d] [him] for a urology consultation." *Id.* at ¶ 158.

The medical records during this time do not show that Dr. Perez or other members of the medical staff ordered any treatment for Mr. Vickery's pain or underlying condition. *See generally* dkt. 213-13 at 63-80; dkt. 228-6 at 6-9. In a medical record following the CT scan on March 24, 2020, Dr. Perez wrote, "No uro consult needed at this point. Drink plenty of fluids." Dkt. 213-13 at 76.

On May 7, 2020, an emergency "signal 3000" was called after Mr. Vickery experienced "abdominal pain and vomiting." Dkt. 228-6 at 10-13. According to the medical record, he was "observed laying on his right side curled up in fetal position. Ofd. vomited 2 times while still in the dorm . . . Ofd. brought to HCU where he continue[d] to vomit. . . . Ofd. in increased visible pain gripping at

stomach and rolling from side to side." *Id.* at 13. Nurse Practitioner Petty ordered medication for acute pain and nausea. *Id.* After two hours in the medical unit, Mr. Vickery was no longer vomiting, but he was "unsteady with [gait] and still complain[ed] of increased pain." *Id.* A urinalysis was completed "with massive blood and moderate ketones." *Id.* at 22.

In addition to experiencing kidney pain, x-rays taken around this same time showed calcification in Mr. Vickery's vas deferens. Dkt. 228-6 at 15. He asked Dr. Perez what he could do, and Dr. Perez told him that he should drink water and masturbate. Dkt. 228-1 at ¶ 123. On March 16, 2021, Dr. Perez wrote that Mr. Vickery "[s]till [had] question[s] of seminal fluid flow with passing of stones in the semen." Dkt. 213-13 at 411. Dr. Perez submitted an offsite request for a urology appointment, but the request was denied by Utilization Risk Manager Dr. Stephen Ritz, who opined that vas deferens calcification is a benign condition. *Id.* at 411.

At his deposition in June 2022, Mr. Vickery testified that he was still regularly passing kidney stones when he urinates and estimated that he has passed thousands of stones at IDOC. Dkt. 213-12 at 36.

### 5. Shoulder Injury

In early 2019, Mr. Vickery's shoulder was injured during an attack by a fellow prisoner. Dkt. 228-1 at ¶ 99. On July 30, 2019, he reported the persistent shoulder pain to Dr. Perez. Dkt. 213-11 at ¶ 23. Dr. Perez states that he ordered anti-inflammatories and provided instructions on shoulder strengthening exercises. *Id.* Mr. Vickery states that Dr. Perez was dismissive and said he could

18

only be treated for one malady at a time. Dkt. 228-1 at ¶ 99. On August 19, 2019, he told Dr. Perez that he had limited range of motion and was still in pain. Dkt. 213-11 at ¶ 24. Dr. Perez ordered a different anti-inflammatory, Mobic, and recommended that Mr. Vickery continue his strengthening exercises. *Id.*

The pain in Mr. Vickery's shoulder did not go away. Dr. Perez provided injections for pain on September 10, 2019, January 8, 2020, April 15, 2020, July 29, 2020, October 14, 2020, January 6, 2021, and March 3, 2021. Dkt. 213-13 at 6, 24, 30-31, 66-67, 117-19, 171, 414. Mr. Vickery's affidavit states that he told Dr. Perez that the shoulder injections were not helping. Dkt. 228-1 at ¶ 164. Dr. Perez, however, says that Mr. Vickery told him that these injections helped relieve his shoulder pain. Dkt. 213-11 at ¶¶ 37, 48, 62, 68. Dr. Perez also states that he "never saw Mr. Vickery present with any symptoms indicating that he had lost significant function in his shoulder or was a strong surgical candidate." *Id.* at ¶ 88.

In the medical record from July 6 appointment, Dr. Perez noted that Mr. Vickery's shoulder was atrophying and diagnosed him with rotator cuff syndrome. Dkt. 228-6 at 33-34. Dr. Perez wrote he would "try OPR for MRI" of Mr. Vickery's shoulder, *id.*, but there is no medical record of an offsite request for a shoulder MRI, and Dr. Perez does not mention one in his affidavit, Dkts. 213-11, 213-13.

Mr. Vickery states that he brought his shoulder condition to the attention of Nurse Practitioner Petty and "and every other Wexford medical staff person that [he] saw." *Id.* at ¶ 108. Nurse Practitioner Petty allegedly told him that if he

19

wanted first-class medical care, then he should not have come to prison. *Id.* at ¶ 109.

After Centurion replaced Wexford as IDOC's medical provider, Mr. Vickery saw prison physician Dr. Mark Stine. *Id.* at 180. On September 27, 2021, Dr. Stine measured Mr. Vickery's range of motion and categorized the condition as "moderate-severe." Dkt. 228-9 at 58. Dr. Stine noted, "No prior tx except steroid injections = short-term help only)." *Id.* at 64. After several months of physical therapy, Dr. Stephanie Riley ordered an MRI and an offsite consultation with an orthopedic surgeon. *Id.* at 66-71. The MRI showed osteoarthritis, a small full-thickness tear in his rotator cuff, a small tear at the junction of the superior and posterior labra, and tendonitis. *Id.* at 75. Mr. Vickery was sent to an orthopedic surgeon on April 20, 2022, who recommended surgery. *Id.* at 93. Mr. Vickery had shoulder surgery on July 25, 2022. *Id.* at 107-09; dkt. 228-1 at ¶ 182.

### D. Treatment at New Castle Under Dr. Falconer

Mr. Vickery was transferred to New Castle Correctional Facility on May 19, 2021. Dkt. 213-11 at ¶ 85. That day, Dr. Falconer met with Mr. Vickery. Dkt. 213-13 at 377. Dr. Falconer stated that Mr. Vickery was in the infirmary due to his toe ulcer and "voices no complaints at this time." *Id.* The next day, Dr. Falconer noted that Mr. Vickery "has rotator cuff syndrome and was approved for physical therapy but it was postponed due to the Covid-19 pandemic." *Id.* at 371. Dr. Falconer's plan was to "refer to onsite physical therapy evaluation and treatment[.] Tylenol for pain as needed." *Id.*

Dr. Falconer met with Mr. Vickery again on May 24, 2021, after his return from an appointment with an orthopedic surgeon. *Id.* at 368-69. They had another appointment on June 1, 2021, and Dr. Falconer noted that Mr. Vickery was "awaiting scheduled amputation of L great toe." *Id.* at 368. They had another appointment on June 8, 2021, the day before Mr. Vickery's amputation. *Id.* The orthopedic surgeon amputated Mr. Vickery's toe on June 9, 2021. *Id.* at 386. The surgeon inserted an intrathecal "pain pump." *Id.* The pain pump "infuse[d] a local anesthesia to the location of the amputation, for localized pain relief." Dkt. 213-8 at ¶ 10.

Dr. Falconer met with Mr. Vickery the day after his amputation. *Id.* at 360-62. In the medical record, Dr. Falconer wrote "Patient is doing well. Post-op pain minimal. No clinical signs or symptoms of infection." *Id.* at 360. He continued Mr. Vickery on intravenous antibiotics and Tylenol. Dkt. 213-8 at ¶ 10.

On June 15, 2021, Dr. Falconer noted that Mr. Vickery "stated during morning rounds that he feels like his L great toe is still there even though he knows it has been amputated. States he has no significant pain in his left foot or site of toe amputation and is more concerned with his back pain and pain in right armpit." Dkt. 213-13 at 351. He continued Mr. Vickery on Tylenol and also prescribed Cymbalta. *Id.* at 352-53. Mr. Vickery told Dr. Falconer that Cymbalta made him feel suicidal, but Dr. Falconer did not prescribe an alternative medication. Dkt. 228-1 at ¶ 177.

On June 17, 2021, Dr. Falconer requested a follow-up appointment with the orthopedic surgeon. *Id.* at 347-49. On June 21, 2021, Dr. Falconer assessed

Mr. Vickery for lymph node swelling and back pain. *Id.* at 345-46. That same day, Dr. Falconer submitted a request for Mr. Vickery to receive physical therapy for his "abnormal gait" following the amputation. *Id.* at 241-43. Mr. Vickery had a physical therapy appointment for his abnormal gait three days later. *Id.* at 237-40. On June 28, 2021, Dr. Falconer discharged Mr. Vickery from the infirmary. Dkt. 228-9 at 44-45.

Dr. Falconer's position at New Castle ended on June 30, 2021. Dkt. 213-8 at ¶ 19. On July 7, 2021, Centurion physician Dr. John Nwannunu started Mr. Vickery on Neurontin after his follow-up appointment with the orthopedic surgeon. *Id.* at 387; dkt. 213-8 at ¶ 23.

### E. Alleged Retaliation by Mr. Southwick

Mr. Southwick is an addiction recovery specialist. Dkt. 213-7 at ¶ 1. He administered a substance abuse program at Putnamville called "Recovery While Incarcerated," which is abbreviated as "RWI." *Id.* at ¶ 2. Mr. Vickery was enrolled in this program at Putnamville from February 18, 2021, until his transfer on May 19, 2021. *Id.* at ¶ 4. Mr. Vickery made good progress in this program—attending group therapy sessions, showing knowledge and understanding of coping skills strategies, and making connections with his peers. *Id.* at 6.

When he was transferred to New Castle in May 2021, Mr. Vickery was enrolled in Level III of RWI and was receiving inpatient treatment. *Id.* at ¶ 7. Mr. Vickery believes he was eligible to transition to outpatient treatment on March 24, 2021, shortly after he completed Level I of RWI. Dkt. 228-1 at ¶ 189. His

medical records include a note from Mr. Southwick on March 24, 2021, stating, "Client will continue in RWI services in OP (Outpatient Programming), SLE (Sober Living Environment), and Progress 1." Dkt. 228-9 at 141.

During his deposition, Mr. Vickery testified that Mr. Southwick told him, "You do qualify for outpatient . . . but right now you have this legal action going on and you're at the law library every week . . . so I just don't feel like I can let you go to outpatient while you have this legal stuff going on." Dkt. 213-12 at 21. Mr. Vickery testified that he was spending only three hours a week in the law library at that time, and that Mr. Southwick refused to let him transition to outpatient care because of the legal action itself, and not because working on the legal action prevented him from engaging in outpatient care. *Id.* at 22.[3]

Since Mr. Vickery did not transition to the outpatient treatment dorm, he was ineligible to participate in another program, called the "You Yes You" program ("YYY"). *Id.* at ¶ 193. YYY helps inmates reestablish their relationships with their children and allows their children to interact with them at the prison through activities like the daddy-daughter dance and holiday parties. *Id.* at ¶ 192. From Mr. Vickery's perspective, "the loss of the opportunity to re-establish relationships with [his] children when [he] was still in prison [was] a substantial loss and a real deprivation." *Id.* at ¶ 199.

---

[3] Mr. Southwick's affidavit says that Mr. Vickery would be eligible for outpatient care when he began Level IV, dkt. 213-7 at ¶ 1, and his medical records include a May 20, 2021 recommendation from Mr. Southwick that he begin Level IV, dkt. 213-13 at 375-76.

### III. Discussion

Mr. Vickery raises Eighth Amendment medical-care claims against all Defendants except Mr. Southwick, and a First Amendment retaliation claim against Mr. Southwick.

### A. Eighth Amendment Medical Claims

#### 1. Deliberate Indifference Standard

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For the purposes of this motion, it's undisputed that Mr. Vickery's medical needs were serious. *See* dkt. 211 at 8. To survive summary judgment, Mr. Vickery must therefore show that the defendants acted with deliberate indifference—that is, consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

24

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Mr. Vickery "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id.* "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42.

### 2. Wexford

Private corporations acting under color of state law—like Wexford—are treated as municipalities for purposes of § 1983 and can be sued when their actions violate the Constitution. *Dean*, 18 F.4th at 235 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "In applying *Monell* . . . one key is to distinguish between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices." *Howell v. Wexford Health Servs.*, 987 F.3d 647, 654 (7th Cir. 2021). There are no "bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *Id.* "What is needed is evidence that there is a true . . . corporate policy

at issue, not a random event." *Id.* In other words, the "critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?". *Glisson v. Ind. Dept. of Corrections*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc).

Here, Mr. Vickery has designated evidence that Dr. Perez told him "repeatedly" that "Lantus was too expensive to give inmates in prison," and that Nurse Petty and Nurse Moothery told him the same thing. Dkt. 228-1 at 7–8, 23–24. He has also designated evidence that Dr. Perez and Nurse Petty told him several times regarding his toe and shoulder injuries that "Wexford did not approve inmates to see outside specialists" or to have MRIs "unless they were dying." *Id.* at 12, 14–15, 17, 19, 21–22, 24, 33–34. That's enough to create a triable issue of fact on his claims related to Lantus, his toe, and his shoulder because the evidence goes to Wexford's policy or customs instead of the actions of individual medical providers. *See Glisson*, 849 F.3d at 381. Indeed, there's no indication why those employees would care—individually—about the cost of treatment or whether an inmate sees an outside specialist or receives an outside test. Those would be Wexford's concerns. *See Howell*, 987 F.3d at 654.

Defendants nevertheless argue that Mr. Vickery cannot proceed on a *Monell* claim because he relies solely on "his own circumstances and care." Dkt. 211 at 32; *see Dean*, 18 F.4th at 240 (the Seventh Circuit has "repeatedly rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations"). Here, though, Mr. Vickery is not trying to infer corporate action from his medical care, but instead relies on

statements from Wexford employees that Wexford did not allow them to provide certain care because of its cost. That's enough for a reasonable jury to find *Monell* liability. *See Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021) (plaintiff may prove *Monell* liability by showing an "official policy" or "that the unconstitutional action was done pursuant to a custom—even one that is not formally codified").

Wexford's motion for summary judgment is **DENIED**.

### 3. Dr. Falconer

Dr. Falconer was Mr. Vickery's treating physician for less than six weeks. During that time, he provided intravenous antibiotics, prescribed pain medications, requested physical therapy, requested follow-up care with the orthopedic surgeon, and met with him several times before and after his toe amputation. The designated evidence relating to Dr. Falconer's treatment of Mr. Vickery does not support a finding of deliberate indifference. *Petties*, 836 F.3d at 728 (courts "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs").

Mr. Vickery nevertheless argues that Dr. Falconer was deliberately indifferent to his serious medical needs for three reasons. First, he "refus[ed] to give Mr. Vickery the pain medication as prescribed by his surgeon," specifically Neurontin. *Id.* at 19. Second, he "brushed off his on-going complaints of shoulder pain as insignificant and failed to pursue an MRI of his shoulder." Dkt. 227 at 11. And third, he "knew of his severe kidney pain, but did nothing to treat it." *Id.* at 20.

The designated evidence does not show that the orthopedic surgeon ordered Neurontin after the surgery. The operative report does not mention Neurontin; instead, it mentions the implantation of a pain pump. Dkt. 213-13 at 386. There is evidence that the surgeon ordered Neurontin at a follow-up on July 7, but by that time, Dr. Falconer was no longer employed at New Castle.

Mr. Vickery faults Dr. Falconer for prescribing only Cymbalta to manage his pain when Mr. Vickery had previously told Dr. Falconer that Cymbalta made him feel suicidal. Dkt. 227 at 19-20. But Mr. Vickery was also receiving pain relief from the pain pump and Tylenol. Dkt. 213-13 at 357-62, 386. And to the extent it was error for Dr. Falconer to fail to prescribe an alternative to Cymbalta in addition to the other pain medications, this was an isolated incident and therefore insufficient to support a finding of deliberate indifference when viewed in the context of the totality of post-operative care Dr. Falconer provided. *See Reck v. Wexford Health Servs.*, 27 F.4th 473, 483 (7th Cir. 2022) (holding that deliberate indifference is something more akin to criminal recklessness rather than mere negligence).

Second, with respect to his shoulder and kidney pain, Dr. Falconer told Mr. Vickery that they needed to deal with his bone infection, prepare for amputation, and get him through recovery before they could move on to treating those other chronic medical issues. Dkt. 213-12 at 19. Managing and prioritizing Mr. Vickery's multiple, complex, and chronic medical issues is a matter requiring professional medical judgment. Mr. Vickery has not designated evidence that triaging his toe amputation and recovery from surgery over his other chronic (but

not life-threatening) conditions was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Dean*, 18 F.4th at 241.

Moreover, Dr. Falconer left his employment at New Castle two days after Mr. Vickery was discharged from the infirmary post-surgery. Dkt. 213-8 at ¶¶ 18, 19. Dr. Falconer therefore did not fail to treat his shoulder or kidney pain after Mr. Vickery's recovery.

Dr. Falconer's motion for summary judgment is **GRANTED**.

### 4. Nurse Forquer

Mr. Vickery argues that Nurse Forquer was deliberately indifferent because she "assented to" Dr. Mitcheff's order to give him Novolin, which she knew Mr. Vickery was allergic to. Dkt. 227 at 8-11.

While Nurse Forquer was a member of the nursing staff who may have known that Mr. Vickery was allergic to Novolin, she was not authorized to diagnose Mr. Vickery or prescribe specific care, and there is no evidence she could have overruled Dr. Mitcheff's formulary exception denial with respect to Lantus. Dkt. 213-2 at ¶ 19. She also did not administer the Novolin injections that led to his allergic reactions, as these injections were administered by Nurse Feider and Nurse McGarr at Dr. Perez's direction. Dkt. 213-12 at 38-39. Thus, she was not personally involved in this allegedly unconstitutional conduct and is not liable under § 1983. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (cleaned up); *Wolf-Lillie v. Sonquist*, 699

F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation . . . . A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

For these reasons, Nurse Forquer's motion for summary judgment is **GRANTED**.

### 5. Nurse Pierce

Nurse Pierce argues that she was not authorized to make treatment decisions, that Mr. Vickery had regular appointments with a licensed physician and nurse practitioner, and that there is no evidence that she was deliberately indifferent to his requests for health care. Dkt. 211 at 11-14.

Mr. Vickery does not contest these arguments in his response in opposition to summary judgment, *see generally* dkt. 227, and thus forfeits any arguments as to Nurse Pierce's liability. *See Witte*, 434 F.3d at 1038. Accordingly, Nurse Pierce's motion for summary judgment is **GRANTED**.

### 6. Dr. Mitcheff

#### i.    **Lantus prescription**

A health care provider's treatment of a prisoner with a medication that the prisoner is allergic to may constitute deliberate indifference if the health care provider knows of the prisoner's allergy. *See Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001) (quoting *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985)).

Dr. Mitcheff argues that he relied on medical records from Lake County Jail which did not list Novolin as an allergy and showed that Mr. Vickery had been prescribed Novolin for months. Thus, rather than acting out of deliberate indifference, he was merely doing his best with the limited information he had at his disposal to appropriately treat Mr. Vickery while at the same time avoiding the use of expensive non-formulary insulin. Dkt. 211 at 18-22.  The designated evidence on this point, however, is conflicting. Nurse Feider emailed Dr. Mitcheff and informed him that "[t]here is documentation from the county jail where offender Vickery was previously incarcerated at that supports poor tolerance to NPH and Regular insulins." Dkt. 228-5 at 55. This statement from Nurse Feider should have prompted additional investigation to determine what insulins Mr. Vickery had taken in the past and how he responded to them. Instead, Dr. Mitcheff replied, "Looking at his commissary he is not committed to DM control. His use of simple sugars is the etiology of his hypoglycemia." *Id.* Dr. Mitcheff does not explain how those conclusions could support his belief that Mr. Vickery was not allergic to Novolin.

Moreover, Dr. Mitcheff refused to reconsider approving Lantus after Mr. Vickery experienced a significant allergic reaction to Novolin. Dr. Mitcheff forced Mr. Vickery to experience two more, progressively more serious allergic reactions before he revisited the issue. Based on this evidence, a reasonable jury could conclude that Dr. Mitcheff's refusal to approve Dr. Perez's formulary exception request for Lantus arose from deliberate indifference rather than independent medical judgment. This claim **shall proceed**.

###### ii.     Diabetic retinopathy

Mr. Vickery also argues that Dr. Mitcheff was deliberately indifferent to his diabetic retinopathy by "not tak[ing] action to make sure he was actually seen by" an optometrist or ophthalmologist for six months. Dkt. 227 at 22. This argument relates to Mr. Vickery's claim that he did not see an optometrist or ophthalmologist until August 2019, which was six months after he first developed vitreous bleeding, poor vision, and other signs of diabetic retinopathy.

Because this is summary judgment, the Court accepts as true Mr. Vickery's sworn statements that he did not see an eye doctor until August 2019. Still, there is no designated evidence that Dr. Mitcheff was aware of or involved in the denial of those doctor visits or the falsification of any medical records. *See* dkt. 227 at 23–24. Mr. Vickery must show that Dr. Mitcheff "actually knew of and disregarded a substantial risk of harm." *See Petties*, 836 F.3d at 728.

And, if the medical records are accurate, they show that Dr. Mitcheff approved Mr. Vickery for an urgent offsite appointment with an ophthalmologist in March 2019 on the recommendation of the onsite optometrist. Dkt. 213-13 at 262-63. And in July 2019, he approved a request for a follow-up. *Id.* at 188. If Mr. Vickery's treatment was delayed despite those approvals, there's no designated evidence that Dr. Mitcheff caused the delay, was aware of it, or was responsible for avoiding it. *See* dkt. 227 at 23–24.

Without designated evidence that Dr. Mitcheff knew Mr. Vickery's diabetic retinopathy was untreated for six months, or that the reports he received from

the onsite optometrist describing Mr. Vickery's ongoing ophthalmological care were fraudulent, this claim **may not proceed**.

### 7. Dr. Perez

There is conflicting evidence relating to Dr. Perez's treatment of Mr. Vickery's medical needs. Mr. Vickery has designated evidence that Dr. Perez (1) performed painful necrotic tissue debridements without anesthesia, causing Mr. Vickery excruciating pain; (2) inserted a used surgical glove in Mr. Vickery's diabetic toe ulcer; (3) persisted in a course of ineffective treatment of Mr. Vickery's torn rotator cuff by providing allegedly ineffective steroid injections for pain without treating the underlying injury; (4) persisted in ineffective treatment for Mr. Vickery's diabetic ulcer for over two years until the toe had to be amputated by trying to manage the wound onsite even though the "[w]ound cultures always [came] back +MRSA"; (5) persisted in providing Mr. Vickery with Novolin despite his known allergy and multiple allergic reactions; and (6) provided virtually no treatment for Mr. Vickery's kidney pain or vas deferens calcification and did not refer him to a urologist for over 14 months. *See* dkt. 227 at 9–10, 14–16, 20–21

Because the factual disputes must be resolved in Mr. Vickery's favor at summary judgment, the evidence permits a reasonable conclusion that Dr. Perez acted with deliberate indifference to these serious medical needs. *See Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("Persisting in treatment known to be ineffective can constitute deliberate medical indifference, provided that the doctor was subjectively aware that the treatment plan was ineffective."); *Goodloe*

33

*v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (summary judgment reversed where prison doctor "persisted with the TCAA treatment knowing it was not working and that Goodloe continued to suffer from severe rectal pain and ongoing bleeding"); *Petties*, 836 F.3d at 732 (summary judgment reversed where a prison doctor persisted in a providing patient with crutches, rather than immobilizing his ruptured tendon, when he "knew that failure to immobilize an Achilles rupture would impede Petties's recovery and prolong his pain"). These claims **shall proceed to trial**.

Mr. Vickery claims that Dr. Perez was deliberately indifferent to his diabetic retinopathy by "not tak[ing] action to make sure he was actually seen by" an optometrist or ophthalmologist. Dkt. 227 at 22. As with Dr. Mitcheff, there is no evidence that Dr. Perez knew Mr. Vickery had not been to an eye doctor or was responsible for ensuring the visit happened. *See Petties*, 836 F.3d at 728. Thus, this claim **may not proceed**.

Mr. Vickery claims that Dr. Perez failed to follow up and make sure that he received diabetic shoes, which Dr. Perez ordered for him on March 14, 2019. Dkt. 228-1 at ¶¶ 64-65, 68-70. But Mr. Vickery does not point to any evidence that Dr. Perez knew Mr. Vickery had not received these diabetic shoes or was responsible for ensuring that he received them. *See Petties*, 836 F.3d at 728. Thus, this claim **may not proceed**.

For the reasons stated above, Dr. Perez's motion for summary judgment is **granted in part and denied in part**.

### 8. Nurse Practitioner Petty

Mr. Vickery has designated evidence that Nurse Practitioner Petty was present when Dr. Perez performed painful debridements without anesthesia. *See Reck*, 27 F.4th at 485–86 (while a nurse must generally "defer to a treating physician's instructions" "blind or unthinking" deference can be deliberately indifferent); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurses may be deliberately indifferent for deferring when "it is apparent that the physician's order will likely harm the patient"). He has also designated evidence that Nurse Practitioner Petty falsified his medical records, stating that he had no complaints of shoulder pain when he told her the opposite and that he had refused wound care. *See Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (medical recordkeeping issues can be deliberately indifferent if they "hamstr[i]ng . . . proper diagnosis and treatment"). This evidence, if credited by a jury, may support a reasonable finding of deliberate indifference. These claims **shall proceed to trial**.

Mr. Vickery makes the same claims against Nurse Practitioner Petty with respect to diabetic shoes and eye doctor appointments that he makes against Dr. Perez. Dkt. 227 at 14-18. As with Dr. Perez, Mr. Vickery does not point to evidence that Nurse Practitioner Petty knew that he had not received his diabetic shoes or that he went six months without seeing an eye doctor. *See Petties*, 836 F.3d at 728. These claims **may not proceed**.

Mr. Vickery claims that Nurse Practitioner Petty is liable for failing to order or approve Lantus and for his allergic reactions to Novolin. Dkt. 227 at 8-11. But

the decision to discontinue Lantus was made by Dr. Mitcheff, and the administration of Novolin despite previous allergic reactions was performed by Nurse Feider and Nurse McGarr at the direction of Dr. Perez. The evidence does not support a reasonable finding that Nurse Practitioner Petty was personally involved in these decisions, *see Colbert*, 851 F.3d at 657, so these claims **may not proceed**.

Mr. Vickery claims that Nurse Practitioner Petty was deliberately indifferent to his kidney pain and related urological issues and that she complained he was submitting too many healthcare request forms on January 23, 2020. Dkt. 227 at 20-22; dkt. 228-5 at 231 ("Discussed excessive health slip requests . . . 'sarcastic'").

Mr. Vickery developed kidney pain in January 2020. Dkt. 228-1 at ¶ 111. His medical records show that Dr. Perez met with him about his kidney pain on January 8, 2020. Dkt. 213-13 at 117-19. He remained under Dr. Perez's care, and his kidney pain and urological issues were consistently recorded over the next 16 months. *Id.* at 42-43, 47-53, 55-56, 75-93, 97-103, 112-16, 384, 391-92, 400-01. As Mr. Vickery was under the care of Dr. Perez, Nurse Practitioner Petty could generally defer to his decisions with respect to treatment and requests for offsite referrals. *See Reck*, 27 F.4th at 485-86 ("As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions. However, that deference cannot be 'blind or unthinking.'"). There is no evidence that Nurse Practitioner Petty performed a procedure that she knew would be harmful to Mr. Vickery, or that she kept him from reporting his kidney pain to

Dr. Perez. When she was faced with an emergency medical situation involving abdominal pain and vomiting on May 7, 2020, she prescribed Toradol injections to ease Mr. Vickery's pain. Dkt. 213-13 at 47-50. That conduct is inconsistent with deliberate indifference so this claim **may not proceed**.

For the reasons explained above, Nurse Practitioner Petty's motion for summary judgment is **granted in part and denied in part**.

### 9. Nurse Moothery

There is evidence that Nurse Moothery knew that Mr. Vickery had a referral for an offsite ophthalmology appointment and that she knew this referral was not scheduled for another 5-6 months. Dkt. 213-1 at ¶ 9; dkt. 228-1 at ¶ 52. There is also evidence that Nurse Moothery's job duties included scheduling Mr. Vickery for his offsite ophthalmology referral. Dkt. 213-13 at 200. Accepting this evidence as true for purposes of summary judgment, the Court finds that the summary judgment record supports a reasonable inference that Nurse Moothery knew Mr. Vickery needed an ophthalmology referral for a serious medical need but did not schedule this offsite referral for 6 months. Accordingly, this claim **shall proceed to trial**.

Mr. Vickery claims that Nurse Moothery was deliberately indifferent for failing to follow up on his approval for diabetic shoes. Dkt. 227 at 18. But he does not point to evidence that Nurse Moothery knew that he needed diabetic shoes or that she knew Dr. Perez had approved them. *See Petties*, 836 F.3d at 728. Thus, these claims **may not proceed.**

Mr. Vickery claims that Nurse Moothery was deliberately indifferent to his need for Lantus insulin. But decisions regarding whether to treat Mr. Vickery with Lantus were made by Dr. Perez who failed to prescribe insulin for the first few months Mr. Vickery was incarcerated at Putnamville, and Dr. Mitcheff later denied this formulary exception request. Also, the specific decision as to which insulin was appropriate for managing his diabetes was outside the scope of Nurse Moothery's practice. Dkt. 213-1 at ¶ 12. Thus, this claim **may not proceed**.

For the reasons explained above, Nurse Moothery's motion for summary judgment is **granted in part and denied in part**.

### 10.  Nurse McGarr

Nurse McGarr administered a third dose of Novolin after Mr. Vickery had experienced two progressively worse allergic reactions earlier in the week. Dkt. 213-12 at 28-29. "Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). The summary judgment record supports a reasonable inference that Nurse McGarr blindly deferred to Dr. Perez when she administered the third Novolin injection in deliberate indifference to Mr. Vickery's serious medical need. This claim **shall proceed to trial**.

### 11.    Nurse Feider

Nurse Feider administered a second dose of Novolin after Mr. Vickery had experienced an allergic reaction the day before. Dkt. 212-12 at 38-39. She also witnessed his allergic reaction to Novolin on August 2, 2019, after she accidentally administered Novolin instead of Lantus. Dkt. 213-13 at 182-83. The summary judgment record supports a reasonable inference that Nurse Feider blindly deferred to Dr. Perez when she administered the first and second Novolin injections in April 2020 in deliberate indifference to Mr. Vickery's serious medical need. *Berry*, 604 F.3d at 443. This claim **shall proceed to trial**.

Nurse Feider allegedly falsified medical records, stating that Mr. Vickery had refused wound care when, allegedly, she simply did not want to provide wound care. Dkt. 213-12 at 11-12. This claim **shall proceed to trial**. *See Dixon*, 819 F.3d at 348.

### 12.    Nurse Gibbens

Nurse Gibbens allegedly falsified medical records, stating that Mr. Vickery had refused wound care when, allegedly, she simply did not want to provide wound care. Dkt. 213-12 at 18; 213-13 at 241, 244, 248; dkt. 228-1 at ¶¶ 89-91, 108-09, 114. If true, these allegations may show deliberate indifference. This claim **shall proceed to trial**. *See Dixon*, 819 F.3d at 348.

### 13.    Expert Report

The defendants have retained the services of expert witness Dr. Larry "Skip" Hunefeld. Dkt. 213-15. Dr. Hunefeld has reviewed the IDOC and jail medical records, the complaint, and Mr. Vickery's deposition. *Id.* at 1. He has

"no significant criticisms" regarding the care Mr. Vickery received at IDOC, and he does not believe that any physicians or staff inside IDOC caused Mr. Vickery's toe to require amputation. *Id.*

While Dr. Hunefeld's expert report is evidence in the defendants' favor, it is not dispositive at summary judgment. Dr. Hunefeld's report does not address certain claims and it resolves factual disputes in Defendants' favor instead of Mr. Vickery's. For example, the report presumes that Mr. Vickery received Novolin for months at Lake County Jail without having allergic reactions, despite contrary evidence. *Id.* at 2. It also compares Mr. Vickery's treatment A1C levels at IDOC to his A1C levels when he first arrived at the jail, noting significant improvement, but it does not acknowledge that his A1C levels were consistently higher at IDOC than they were at the jail where he had received Lantus. *See* dkt. 228-2 at 14, 20, 104; dkt. 213-13 at 204.

The report then does not address whether it was appropriate for Dr. Perez to debride necrotic tissue without anesthesia, or for Dr. Perez to place a used surgical glove in Mr. Vickery's ulcer during a debridement. It also does not specifically address whether Mr. Vickery's torn rotator cuff, kidney stones, and vas deferens calcification were appropriately treated. Dkt. 213-15 at 4.

In sum, Dr. Hunefeld's opinions are relevant, but do not entitle Defendants to summary judgment.

## B. Retaliation

### 1. Legal Standard

Courts apply a burden-shifting analysis to determine whether there is a triable issue of fact on First Amendment retaliation claims. *Bless v. Cook County Sheriff's Office*, 9 F.4th 565, 571 (7th Cir. 2021). To make a prima facie case of retaliation, Mr. Vickery must demonstrate (1) that he engaged in a protected First Amendment activity; (2) that he suffered a deprivation that would reasonably deter First Amendment activity in the future; and (3) that the First Amendment activity was at least a motivating factor in Mr. Southwick's decision to take the adverse action. *Id.*

If Mr. Vickery makes a *prima facie* case, the burden shifts to Mr. Southwick to give a non-retaliatory basis for the adverse action. *Id.* at 573. Then, the burden shifts back to Mr. Vickery to show that Mr. Southwick's proffered basis for the adverse action was a pretext, or a "phony excuse," that is unworthy of credence. *Id.*

If Mr. Vickery presents evidence that would allow a reasonable factfinder to conclude that Mr. Southwick's purported non-retaliatory basis was a pretext, his claim would survive summary judgment and proceed to trial. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

### 2. *Prima Facie* Case

Mr. Southwick does not dispute that Mr. Vickery engaged in protected First Amendment activity by filing this lawsuit. *See generally* dkt. 211 at 9-10. So, Mr. Vickery satisfies the *prima facie* case requirement upon showing that Mr.

41

Southwick inflicted a deprivation that was reasonably likely to deter future First Amendment activity and was motivated by Mr. Vickery's First Amendment activity.

### i.   Deprivation

Mr. Southwick argues that there "can be no retaliation claim against [him] because Plaintiff was not deprived of addiction recovery services." *Id.* at 10. Mr. Vickery responds that the deprivation was Mr. Southwick's refusal to transition him to outpatient care disqualified him from the YYY program, thereby preventing him from restoring broken ties with his children and participating in events like daddy-daughter dances and holiday parties. Dkt. 227 at 4-5. In reply, Mr. Southwick argues that he had "no involvement with, or control over, the YYY program." Dkt. 234 at 2.

But Mr. Southwick was positioned, through his stewardship of the RWI program, to prevent Mr. Vickery's participation in the YYY program and thereby force him to choose between the benefits of that program and pursuing this lawsuit. And Mr. Vickery testified that he told Mr. Southwick that his YYY program participation hinged on being outpatient. Dkt. 213-12 at 21. A person of ordinary firmness would think twice before risking the chance to participate in that program, since it offers inmates the opportunity to connect and spend time with their children. Thus, Mr. Vickery has designated evidence that he suffered a deprivation reasonably likely to deter future First Amendment activity.

### ii.   Motivation

Mr. Vickery testified that Mr. Southwick told him that he was refusing to let him transition to outpatient care, and thus participate in the YYY program, because he was pursuing this lawsuit. Dkt. 213-12 at 21. This is direct evidence of a retaliatory motive, satisfying the motivation element of his *prima facie* case.

### 3. Pretext

Since Mr. Vickery has made his *prima facie*, the burden shifts to Mr. Southwick provide a non-retaliatory basis for his action. *Bless*, 9 F.4th at 571. Mr. Southwick argues that he had a good faith basis since Mr. Vickery "was not eligible for outpatient classification until he completed Phase III, which did not occur until the time of his transfer." Dkt. 211 at 10.

In response, Mr. Vickery points to the March 24, 2021, Addiction Recovery record in which Mr. Southwick wrote "Client will continue in RWI services in OP (Outpatient Programming), SLE (Sober Living Environment), and Progression 1." Dkt. 228-9 at 141. Mr. Vickery argues that this document shows he was eligible for outpatient programming, and that Mr. Southwick's purported non-retaliatory explanation is a pretext. Dkt. 227 at 6. In reply, Mr. Southwick says that Mr. Vickery "simply misreads the medical records" and that a "sober living environment" was part of the inpatient program. Dkt. 234 at 3 (citing dkt. 233 at ¶ 6-7).

The document itself, however, is designated evidence that Mr. Southwick approved Mr. Vickery for "Outpatient Programming" on March 24, 2021. Perhaps in the RWI program, "Outpatient Programming" and "Outpatient Care" mean

different things, but Mr. Southwick has not shown that in the designated evidence, especially considering Mr. Vickery's testimony that Mr. Southwick expressly told him that he was preventing his transition to outpatient care because he was pursuing this lawsuit.

Mr. Vickery has designated evidence allowing a reasonable jury to find that Mr. Southwick's non-retaliatory basis for not allowing Mr. Vickery to transition to outpatient care was pretextual, so Mr. Southwick's motion for summary judgment is **denied**.

### IV. Conclusion

The motion for summary judgment is **granted** as to Dr. Falconer, Nurse Forquer, and Nurse Pierce; **granted in part and denied in part** as to Dr. Mitcheff, Dr. Perez, Nurse Practioner Petty, and Nurse Moothery; and **denied** as to the remaining defendants. Dkt. [210]. The defendants' request for oral argument, dkt. [235], is **denied** because their summary judgment motion could be resolved without argument.

The **clerk shall** terminate Dr. Falconer, Nurse Forquer, and Nurse Pierce as defendants on the docket.

The **Magistrate Judge** is asked to hold a telephonic status conference to address settlement and trial readiness.

**SO ORDERED**.

Date: 3/13/2024

James Patrick Hanlon
James Patrick Hanlon
United States District Judge
Southern District of Indiana

44

Distribution:

LARRY VICKERY
251617
SOUTH BEND - CRC
South Bend Community Re-Entry Center
4650 Old Cleveland Rd.
South Bend, IN 46628

All electronically registered counsel